## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 18 2018, 10:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Deborah Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

A.D.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

June 18, 2018

Court of Appeals Case No.
18A-JV-6

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge
The Honorable
Geoffrey A. Gaither, Magistrate

Trial Court Cause No.
49D09-1709-JD-1222

**Kirsch, Judge.**

[1] A.D. appeals his adjudication as a delinquent child for resisting law enforcement,[1] which would be a Class A misdemeanor if committed by an adult. He raises the following issue for our review on appeal: whether the State presented sufficient evidence sufficient evidence to show that the stop of A.D. was supported by reasonable suspicion under the Fourth Amendment and was also reasonable based on the totality of circumstances under the Indiana Constitution.

[2] We affirm.

## Facts and Procedural History

[3] Around 8:30 p.m. on September 7, 2017, A.D. and seven or eight other juveniles entered Rickers BP gas station on Georgetown Road in Indianapolis, Indiana. *Tr. Vol. II* at 8, 15, 18. The store clerk observed that three of the juveniles wore backpacks, and the rest wore hoodies. *Id.* at 18, 21. Two of the juveniles proceeded to the counter while the others went to the candy aisle and filled their bags with candy before walking out of the store. *Id*. at 18. The store clerk observed most of the juveniles running while holding items in their hands such as "[c]andy, juice, chips, things like that." *Id*. at 21. The store clerk called the police to report the theft and described the juveniles, including their attire and the direction in which they fled. *Id*. at 22.

---

[1] *See* Ind. Code § 35-44.1-3-1(a)(3).

[4] Indianapolis Metropolitan Police Department ("IMPD") Officer Christian Burney ("Officer Burney") was on patrol in his police vehicle when he observed a group of about six juveniles running northbound from the BP parking lot. *Id.* at 29-30. Officer Burney made contact with IMPD Officer Matthew Pankonie ("Officer Pankonie") and told Officer Pankonie that he had observed a group of juveniles run northbound across 56th Street, coming from the BP and going behind the Marathon gas station. *Id.* at 36-37. Shortly thereafter, Officer Burney heard a radio report of a theft in progress at the BP. *Id.* at 31. While stopped at a red light, Officer Pankonie heard the radio dispatch of a theft in progress at the BP by a group of juveniles, who had then fled from the store. *Id.* at 37. Officer Pankonie proceeded to drive northbound on 56th Street and then made a u-turn to travel back southbound, when he saw a group of juveniles walking through the parking lot of a Boston Market restaurant about 100 yards from the BP. *Id.*

[5] Officer Pankonie activated his vehicle's lights and pulled into a nearby Wendy's parking lot when "two juveniles ran southbound away from [him]." *Id.* at 38. Officer Pankonie exited his vehicle and "observed two juveniles running southbound wearing gray hoodies, [and] one with a backpack, [running] southbound in the Boston Market parking lot." *Id.* at 42-43. Officer Pankonie "yelled in a loud manner, 'Stop, police.'" *Id.* at 38, 43. The juveniles did not stop running, so Officer Pankonie notified his partners and began pursuit of the juveniles. *Id.* at 42. Officer Pankonie pursued the juveniles on foot until he lost sight of them when they entered a tree line behind the strip mall. *Id.* at 43.

[6] When Officer Pankonie approached the tree line, he drew his gun and ordered the juveniles to come out from where they were hiding. *Id.* The juveniles emerged, one of whom was later identified as A.D. *Id.* at 44-45. A.D. had a candy wrapper in his hand and wore a backpack. *Id.* at 43. Officer Pankonie handcuffed A.D. and waited for backup to handcuff the other juvenile. *Id.* at 44.

[7] Officer Pankonie conducted a search incident to arrest and discovered that the backpack belonging to the other juvenile contained candy and a drink that matched the description of items stolen from the BP. *Id.* at 46-48. The officers arrested A.D. and the other juvenile for theft[2] and resisting law enforcement, acts which would both be Class A misdemeanors if committed by an adult. *Id.* at 46. During the denial hearing, A.D. objected to testimony regarding what occurred after Officer Pankonie stopped A.D. on the basis that the detention violated his rights under the United States and Indiana Constitutions because the stop was not based on reasonable suspicion. *Id.* at 41. At the conclusion of the hearing, A.D. was adjudicated a juvenile delinquent for an act which would be Class A misdemeanor resisting law enforcement if committed by an adult. *Id.* at 54. A.D. now appeals, arguing that the evidence was insufficient to support his adjudication because the stop violated his federal and state constitutional rights.

---

[2] The trial court found that the State failed to meet its burden as to the theft count and entered a not true finding on that charge. *Tr. Vol. II* at 54.

# Discussion and Decision

[8]    When reviewing a claim of sufficiency of the evidence with respect to juvenile adjudications, we do not reweigh the evidence or judge the credibility of the witnesses. *D.W. v. State*, 903 N.E.2d 966, 968 (Ind. Ct. App. 2009), *trans. denied*. We look only to probative evidence supporting the adjudication and the reasonable inferences that may be drawn from the evidence to determine whether a reasonable trier of fact could conclude the juvenile was guilty beyond a reasonable doubt. *Id*. If there is substantial evidence of probative value to support the adjudication, it will not be set aside. *Id.* The uncorroborated testimony of one witness may be sufficient by itself to sustain an adjudication of delinquency on appeal. *J.D.P. v. State*, 857 N.E.2d 1000, 1010 (Ind. Ct. App. 2006).

[9]    To convict A.D. of resisting law enforcement as charged, the State was required to prove beyond a reasonable doubt that A.D. fled from the law enforcement officers after the officers, by visible and audible means, identified themselves and ordered A.D. to stop. Ind. Code § 35-44.1-3-1(a)(3). Although the resisting law enforcement statute, on its face, does not expressly require the order to stop to be lawful, in order to interpret the statute as constitutional, the Indiana Supreme Court has explained that such an order to stop must be understood to require probable cause or reasonable suspicion. *Gaddie v. State*, 10 N.E.3d 1249, 1254-55 (Ind. 2014). Absent proof that an officer's order to stop rests on probable cause or on reasonable suspicion, which is defined as specific, articulable facts that would lead the officer to reasonably suspect that criminal

activity is afoot, the evidence will be insufficient to establish the offense of resisting law enforcement. *Id*. at 1255.

[10] A.D. first argues that the police lacked reasonable suspicion to detain and seize him under the Fourth Amendment to the United States Constitution. A.D. contends that the State failed to prove articulable facts -- other than the fact that A.D. was a juvenile -- that justified Officer Pankonie's stop of A.D. However, we find the evidence was sufficient to support that Officer Pankonie had reasonable suspicion to detain and seize A.D. Shortly after the theft occurred at the BP gas station, and just before the call came in to dispatch, Officer Burney notified Officer Pankonie that he had just seen a group of juveniles running from the BP gas station and across the street behind the Marathon gas station and CVS. While waiting for the traffic light to cycle, Officer Pankonie received a call from dispatch. Dispatch relayed that a gas station clerk from the BP gas station reported having seen a group of five black males run out of the store without paying for their candy, chips, and juice. Dispatch also relayed the gas station clerk's description of what the males were wearing and in which direction they had gone. Relying on the information received from both dispatch and Officer Burney, Officer Pankonie located a group of juveniles walking across the Boston Market parking lot, which is in close proximity to the BP gas station. A.D. was found with a group of juveniles matching the description of the group who had committed a theft at the BP gas station, was found within close proximity to the gas station shortly after the theft had occurred, and ran once Officer Pankonie activated the lights on his police

vehicle and pulled into the parking lot; accordingly, the evidence was sufficient to support that Officer Pankonie had reasonable suspicion to detain and seize A.D. under the Fourth Amendment to the United States Constitution.

[11] A.D. also argues that the police violated his rights under Article 1, Section 11 of the Indiana Constitution. A.D. contends that Officer Pankonie's conduct was unreasonable under the totality of the circumstances. In evaluating the reasonableness of police conduct under Article 1, Section 11 of the Indiana Constitution, a reviewing court considers: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Carpenter v. State*, 18 N.E. 998, 1002 (Ind. 2014).

[12] In the present case, there was a high degree of concern, suspicion, or knowledge that a violation had occurred. A theft of candy, chips, and drinks had just occurred at the BP gas station by a group of juveniles. A.D. was found within a close proximity to the gas station shortly after the theft with a group of juvenile males matching the description of the suspects that the gas station clerk provided to dispatch. A.D. also fled when Officer Pankonie pulled into the parking lot and initiated the lights on his police car. Additionally, the degree of intrusion that the method of the search imposed on A.D.'s ordinary activities was small. Officer Pankonie ordered A.D. and the other juvenile to come out from the wooded area, and he performed a search incident to arrest. *Tr. Vol. II* at 46-48. Finally, the extent of law enforcement needs was high. A theft of

several items of the BP gas station's merchandise had just occurred, and the police officers were doing their job by conducting an investigation, locating the individuals that were responsible, and returning the merchandise back to the BP gas station. Therefore, the evidence was sufficient to support that Officer Pankonie, under the totality of the circumstances, displayed reasonable conduct by detaining and seizing A.D. under Article 1, Section 11 of the Indiana Constitution. Because we have concluded that the stop of A.D. did not violate either the Fourth Amendment or Article 1, Section 11 of the Indiana Constitution, the evidence presented was sufficient to sustain A.D.'s adjudication for an act that would be a Class A misdemeanor resisting law enforcement if committed by an adult.

Affirmed.

Baker, J., and Bradford, J., concur.